**IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF FLORIDA GAINESVILLE DIVISION**

**UNITED STATES OF AMERICA** 1:20CR18 AW/GRJ

**v.** **INFORMATION**

**ANTHONY HERNANDEZ**
_________________________________/

**THE UNITED STATES ATTORNEY CHARGES:**

**COUNT ONE**

**A. INTRODUCTION**

At all times relevant to this Information:

1. The term "health care benefit program," as defined in Title 18, United States Code, Section 24, means any public or private plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service for which payment may be made under the plan or contract.

2. Cigna, Blue Cross and Blue Shield of Florida ("BCBS"), Aetna, and United Healthcare ("UHC") were private health insurance companies that provided health insurance to members and issued payments to its providers for covered medical services. The health insurance offered by Cigna, BCBS, Aetna, and UHC were health care benefit programs as defined in Title 18, United States Code,

Section 24, and Cigna, BCBS, Aetna, and UHC operated public and private health care plans and contracts affecting commerce under which medical benefits, items, and services were provided to individuals.

3. Private health insurance companies, including Cigna, BCBS, Aetna, and UHC, would only pay for treatment or services that were medically necessary and that met the criteria for billing of services. To receive reimbursement for covered services, health care providers mailed or submitted by electronic wire a Health Care Claim Form (commonly called a HCFA 1500) that included CPT Codes to identify the procedures that were purportedly provided to insured patients. This form required the provider to include information regarding the patient, the dates of service, the diagnoses of the conditions requiring the services, and the procedures performed. By submitting the HCFA 1500, the provider would represent to the insurer that the services were both medically necessary and actually provided.

4. Generally in order for private health insurance companies, including Cigna, BCBS, Aetna, and UHC, to have paid for a service, the service must have been rendered by an appropriate health care provider who was also credentialed with the private health insurance company being billed. In order to identify the health care provider who rendered a particular service to the patient, the HCFA 1500 forms included the NPI for the health care provider who purportedly

provided the service being billed. NPI stands for National Provider Identifier and was a unique 10-digit identification number issued to health care providers in the United States by the Centers for Medicare and Medicaid Services. Private health insurance companies paid providers based on the representations on the HCFA 1500 forms submitted to them by providers.

5. With respect to procedures for which payment was sought from private health insurance companies through the HCFA 1500 forms, providers, including Primera Medical Group, Inc. ("PMG") and Gainesville Medical Center ("GMC"), used the codes established in the Physicians' Current Procedural Terminology code book ("CPT") to indicate what services were rendered to patients. CPT codes 95018 and 95004 were assigned for allergy testing. These procedures involved allergy testing, any combination of percutaneous (scratch, puncture, prick) and intracutaneous (intradermal), sequential and incremental, with drugs or biologicals, immediate type reaction, including test interpretation and report, specify number of tests. CPT code 95165 was indicated for the supervision of preparation and provision of antigens for allergen immunotherapy. CPT codes 95115 and 95117 were indicated for administration of allergy immunotherapy and related services.

6. Upon payment of a health care claim, a private health insurance company, including Cigna, BCBS, Aetna, and UHC, usually sent the patient

beneficiary what was typically called an Explanation of Benefits ("EOB") form, which advised the patient beneficiary what services were billed by their health care provider, how much their private health insurance company paid toward the allowed amount for services rendered, and what additional amount, if any, the patient beneficiary was required to pay.

7. PMG, was a Georgia company, with offices in Atlanta. S.K. was the CEO of PMG and was a Doctor of Chiropractic Medicine who was licensed to practice in Georgia since January 2009. PMG also had an office manager whose responsibilities included oversight of insurance billing.

8. PMG was also known as Primera Health & Wellness, Atlanta Physicians Group, Inc., Atlanta Pain and Injury P.C., and Primera Medical Center. PMG did business under various other entities, including Florida Medical & Allergy Centers, LLC ("FM&AC"), formerly Medical & Injury Centers of Florida ("M&ICF"), which had offices in locations in Florida. PMG claimed to focus its practice on preventative wellness, specifically corporate wellness, concierge care, and allergy testing.

9. PMG conducted its insurance claim processing and billing both internally and through an external biller that electronically received billing codes and other claim information from PMG and the various business through which it was doing business. Once the billing codes and claim information were received,

PMG's internal and external billers electronically submitted the claims to private insurance companies, including Cigna, BCBS, Aetna, and UHC.

10. PMG also did business as Gainesville Medical Center ("GMC"), a Florida company, with an office located in Gainesville, Florida. GMC primarily provided allergy testing and immunotherapy services to its patients. GMC was primarily operated by defendant **ANTHONY HERNANDEZ**. Defendant **ANTHONY HERNANDEZ** caused claims to be submitted to health care benefit programs, including Cigna, BCBS, Aetna, and UHC, for payment for services purportedly provided to patients of GMC. Before GMC severed its business relationship from PMG, claims were submitted to PMG which then electronically submitted them to private insurance companies, including Cigna, BCBS, Aetna, and UHC. After GMC severed its business relationship from PMG, the claims were submitted to private insurance companies, including Cigna, BCBS, Aetna, and UHC directly or through the insurance credentials of a local physician, T.R., who, between 2015 and 2016, became GMC's medical director.

11. In or about October 2015, defendant **ANTHONY HERNANDEZ** severed GMC's business relationship with PMG, and GMC operated as an independent business.

12. Between on or about November 21, 2012, and on or about July 31, 2016, defendant **ANTHONY HERNANDEZ**, S.K., and others maintained and

had sole signatory authority on bank accounts ending in -2587 and -2595, in the name of M&ICF d/b/a GMC, at Bank of America, a financial institution the deposits of which were insured by the Federal Deposit Insurance Corporation ("FDIC").

13. Between in or about November 2012, and in or about July 2016, a person closely related to defendant **ANTHONY HERNANDEZ,** had accounts ending in -6071 and -0457 at Wells Fargo, N.A., a financial institution the deposits of which were insured by the FDIC. Account ending in -6071 was for a loan pertaining to real property located at 3514 NW 12th Avenue, Gainesville, Florida. Account ending in -0457 was for a loan pertaining to real property located at 1219 NW 55th Street, Unit 19, Gainesville, Florida.

14. Between on or about December 26, 2014, and in or about August 2016, defendant **ANTHONY HERNANDEZ**, S.K., and a person closely related to defendant **ANTHONY HERNANDEZ** maintained and had sole signatory authority on accounts ending in -9191 and -9209, in the name of Atlanta Pain and Injury P.C. d/b/a Primera Medical Group of GNV, at Bank of America, a financial institution the deposits of which were insured by the Federal Deposit Insurance Corporation ("FDIC").

15. Before GMC severed its business relationship from PMG, health insurance proceeds for services allegedly rendered by GMC for its patients were

deposited into bank accounts maintained by PMG or GMC after those claims were processed. When a deposit was made into a bank account maintained by PMG, defendant **ANTHONY HERNANDEZ** did not have access to those proceeds until after they were transferred or deposited into a GMC bank account by an employee of PMG. After GMC severed its business relationship from PMG, health insurance proceeds for services allegedly rendered by GMC for its patients were deposited by health insurance companies directly into accounts maintained by GMC which defendant **ANTHONY HERNANDEZ** could access.

## B. THE CHARGE

Between in or about June 2013, and in or about October 2015, in the Northern District of Florida and elsewhere, defendant

**ANTHONY HERNANDEZ,**

in a matter involving a health care benefit program, namely, Cigna, BCBS, Aetna, and UHC, and in connection with the delivery of and payment for health care benefits, items, and services, knowingly and willfully did falsify, conceal, and cover up by trick, scheme, and device a material fact, did make materially false, fictitious, and fraudulent statements and representations, and did make and use a materially false writing and document knowing the same to contain a materially false, fictitious, and fraudulent statement and entry, and by this conduct, received $810,292.47 in falsely obtained proceeds from Cigna, BCBS, Aetna, and UHC.

In violation of Title 18, United States Code, Section 1035.

**COUNT TWO**

**A. INTRODUCTION**

The allegations contained in Section A of Count One are incorporated by reference as if fully set forth herein.

**B. THE CHARGE**

Between in or about June 2013, and in or about October 2015, in the Northern District of Florida and elsewhere, defendant

**ANTHONY HERNANDEZ,**

did knowingly and willfully conspire, combine, confederate, and agree with other persons known and unknown to commit an offense against the United States, that is, to knowingly engage and attempt to engage in a monetary transaction by, through, and to a financial institution, affecting interstate commerce, in criminally derived property of a value greater than $10,000, namely, the depositing, withdrawal, and transfer of funds and monetary instruments, such property having been derived from a specified unlawful activity, that is, an act or activity constituting an offense involving a Federal health care offense as defined in Title 18, United States Code, Section 24, to wit, False Statements Relating to Health

Care Matters, in violation of Title 18, United States Code, Section 1035, in violation of Title 18, United States Code, Section 1957.

### C. OVERT ACTS

To effect the objects of this conspiracy, the defendant and other conspirators committed the following overt acts, among others:

1. To bring in more patients to GMC for allergy testing, defendant **ANTHONY HERNANDEZ** personally and through marketing companies, including Proforma, in which he had an ownership interest, and its employees, recruited people from various groups and organizations, such as fraternities, sororities, and clubs at the University of Florida, and local businesses such as chiropractic practices and spas. Defendant **ANTHONY HERNANDEZ** offered financial compensation to such groups and organizations in exchange for its members to receive allergy testing at GMC. Some prospective patients were told that the allergy testing was free and some were told that there would be no out-of-pocket expenses as their health insurance would cover the cost of testing. Defendant **ANTHONY HERNANDEZ** also offered financial compensation to local businesses in exchange for their assistance in having their patients and customers receive allergy testing at GMC.

2. Defendant **ANTHONY HERNANDEZ** required GMC staff to provide GMC patients with a form through which they consented to allergy

immunotherapy injections, also known as allergy shots, before receiving any allergy testing.

3. Defendant **ANTHONY HERNANDEZ** billed, and directed GMC employees to falsely bill, the patients' private health insurers for services relating to allergy immunotherapy injections. When it billed the private health insurers, GMC used the NPI numbers of multiple doctors, including Dr. JR and Dr. NL, on HCFA 1500 forms. These doctors did not perform the allergy immunotherapy injections billed for many patients.

4. Before GMC severed its business relationship with PMG, defendant **ANTHONY HERNANDEZ** agreed with S.K. to split the insurance proceeds that GMC received, including those relating to false claims for allergy immunotherapy injections.

5. After GMC severed its business relationship with PMG, defendant **ANTHONY HERNANDEZ** billed and directed GMC employees to falsely bill the patients' private health insurers for services relating to allergy testing and for allergy immunotherapy injections that were purportedly rendered by Dr. JR and Dr. NL using the name and NPI of Dr. TR on HCFA 1500 forms. For these claims, the purported dates of service predated Dr. TR's affiliation with GMC or responsibilities as GMC's medical director.

6. On about October 24, 2013, defendant **ANTHONY HERNANDEZ** transferred and caused to be transferred $25,000.00 from Bank of America account number ending in -2595 to Wells Fargo account number ending in -6071.

7. On about October 29, 2013, defendant **ANTHONY HERNANDEZ** transferred and caused to be transferred $15,000.00 from Bank of America account number ending in -2587 to Wells Fargo account number ending in -6071.

8. On about February 18, 2014, defendant **ANTHONY HERNANDEZ** transferred and caused to be transferred $80,010.00 from Bank of America account number ending in -0509 to Wells Fargo account number ending in -0457.

9. On about February 20, 2014, defendant **ANTHONY HERNANDEZ** transferred and caused to be transferred $40,000.00 from Bank of America account number ending in -0509 to Wells Fargo account number ending in -0457.

10. On about April 8, 2015, defendant **ANTHONY HERNANDEZ** transferred and caused to be transferred $11,200.00 from Bank of America account number ending in -2587 to Bank of America account number ending in -2595.

11. On about April 22, 2015, defendant **ANTHONY HERNANDEZ** transferred and caused to be transferred $15,000.00 from Bank of America account number ending in -2587 to Bank of America account number ending in -2595.

12. On about May 7, 2015, defendant **ANTHONY HERNANDEZ** transferred and caused to be transferred $22,500.00 from Bank of America account number ending in -2587 to Bank of America account number ending in -9191.

13. On about June 8, 2015, defendant **ANTHONY HERNANDEZ** transferred and caused to be transferred $18,000.00 from Bank of America account number ending in -2587 to Bank of America account number ending in -6040.

All in violation of Title 18, United States Code, Section 371.

**CRIMINAL FORFEITURE**

The allegations contained in Counts One and Two of this Indictment are hereby realleged and incorporated by reference for the purpose of alleging forfeitures to the United States pursuant to the provisions of Title 18, United States Code, Sections 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), and Title 18, United States Code, Section 982(a)(7). Upon the conviction of the violations alleged in Counts One and Two of this Indictment, the defendant,

**ANTHONY HERNANDEZ**

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any and all property, real or personal, involved in the aforementioned offenses and any property traceable to such property; and pursuant to Title 18, United States Code, Section 982(a)(7), all property, real or personal, that constitutes or is derived,

directly or indirectly, from gross proceeds traceable to the commission of such offenses, including, but not limited to the aggregate sum of $810,292.47.

The property subject to forfeiture includes, but is not limited to, the following:

i. The real property known as 3514 NW 12th Avenue, Gainesville, Florida, lying and being in Alachua County, Florida, and more particularly described in the Official Records at Deed Book 3977, Page 1004 of the public records of Alachua County as follows:

> LOT TWENTY-EIGHT (28), LIBBY HEIGHTS, AS PER PLAT THEREOF RECORDED IN PLAT BOOK "E", PAGE 92 OF THE PUBLIC RECORDS OF ALACHUA COUNTY, FLORIDA

ii. The real property known as 1219 NW 55th Street, Unit 19, Gainesville, Florida, lying and being in Alachua County, Florida, and more particularly described in the Official Records at Deed Book 2937, Page 73 of the public records of Alachua County as follows:

> UNIT NO. NINETEEN (19), OF WOODS EDGE, A CONDOMINIUM, AS PER THAT CERTAIN DECLARATION OF CONDOMINIUM RECORDED IN OFFICIAL RECORDS BOOK 2885, PAGE 1404, OF THE PUBLIC RECORDS OF ALACHUA COUNTY, FLORIDA, TOGETHER WITH AN UNDIVIDED INTEREST IN THE COMMON ELEMENTS AS SET FORTH IN SAID DECLARATIONS.

If any of the property described above as being subject to forfeiture pursuant to Counts One through Two of this Information, as a result of any act or omission of any defendant:

i. cannot be located upon the exercise of due diligence;

ii. has been transferred or sold to, or deposited with, a third person;

iii. has been placed beyond the jurisdiction of this Court;

iv. has been substantially diminished in value; or

v. has been commingled with other property that cannot be divided without difficulty, the United States shall be entitled to forfeiture of substitute property up to the value of the property subject to forfeiture under the provisions of Title 21, United States Code, Section 853(p), which is incorporated by reference in Title 18, United States Code, Section 982(b)(1).

LAWRENCE KEEFE
United States Attorney

July 14, 2020
DATE

JUSTIN M. KEEN
Assistant United States Attorney

07/14/2020
DATE